## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

CHRISTIE STEWART,

        Plaintiff,

    v.

UNITED STATES DEPARTMENT OF
AGRICULTURE,

        Defendant.

Civil Action No. 23-cv-1194 (TSC)

## MEMORANDUM OPINION

Plaintiff Christie Stewart—a disabled Black woman—sued her former employer, the U.S. Department of Agriculture, alleging it violated Title VII of the Civil Rights Act of 1964 and the Rehabilitation Act by, *inter alia*, harassing her, reprimanding her, lowering her performance review, denying her a salary increase, and placing her on administrative leave indefinitely without cause. Defendant moved to dismiss for failure to state a claim. Having considered the record and the briefs, the court will GRANT in part and DENY in part Defendant's motion.

## I.      BACKGROUND

### A.    Factual Background

Plaintiff was hired as a Supervisory Personnel Security Specialist in September 2016. Am. Compl., ECF No. 17 ¶ 9. Throughout her employment, Plaintiff had mental disabilities, including "anxiety disorder, major depression disorder," and post-traumatic stress disorder ("PTSD") as well as "several physical impairments." *Id.* ¶ 111. Despite these challenges, she had received only outstanding performance reviews as of June 2020 and earned a salary increase. *Id.* ¶¶ 19–20.

Plaintiff alleges she began experiencing discrimination in the summer of 2020 when she had a "minor dispute" with a coworker regarding the coworker's suggestions for a presentation Plaintiff put together.  *Id.* ¶ 25.  As a result of the dispute, she was berated and humiliated by her second-line supervisor, and her first-line supervisor made her feel targeted, anxious, and embarrassed by bringing it up in a team meeting.  *Id.* ¶¶ 25–27.  Her first-line supervisor later "presented a falsified note of . . . what occurred" during the meeting to the Equal Employment Opportunity Commission ("EEOC").  *Id.* ¶ 31.

In response to this incident, Plaintiff was "harassed and treated unfairly" in several ways. *Id.* ¶ 35.  She began receiving denials for issuance of contract funds, and additional requirements were placed on only her to obtain such approvals.  *Id.* ¶¶ 35–36.  When she raised her concerns about how she was being treated, her supervisor "began to repeatedly and continuously refer to the way Plaintiff spoke or emailed written communications as 'improper,'" and issued her a note of caution about communication.  *Id.* ¶¶ 37–38.  Plaintiff's third-line supervisor eventually directed her to take a "plain English" class and an interpersonal communication training course. *Id.* ¶¶ 32, 237.  The only other employees Plaintiff knew of who were required to take these classes were also Black women.  *Id.* ¶ 34.  After she repeatedly raised concerns about harassment both at work and by filing an EEO Complaint, her first-line supervisor directed Defendant's labor department to investigate her allegations, but Plaintiff never heard anything further about the investigation.  *Id.* ¶¶ 42–44.  Instead, she later learned that Defendant conducted a "performance assessment" of her, rather than an investigation of her discrimination allegations. *Id.* ¶¶ 46–48, 146–47.

Plaintiff requested reasonable accommodations in August 2020, seeking practical situational telework, an emotional support contact person, ability to remove herself from certain

confrontational situations without reprisal, and greater privacy at work.  *Id.* ¶¶ 112–14.  Before
requesting the accommodations, Plaintiff regularly closed her office door, without any reaction
from her supervisors.  *Id.* ¶ 115.  Once she requested accommodations, however, her supervisors
limited how long she could close her door, and denied her privacy accommodation altogether.
*Id.* ¶¶ 115–17.  Plaintiff's request to telework was approved, but she was told she needed to
provide advance notice of when she would telework, which posed challenges "because her
disabilities were not those that could be planned in advance."  *Id.* ¶¶ 118–20.  Plaintiff's request
for an emotional support contact person was denied, and she was told that instead, her first-line
supervisor would hold biweekly check-ins with her.  *Id.* ¶¶ 128–32, 134.  Her supervisor,
however, "failed to follow through with any of these meetings."  *Id.* ¶ 132.  Finally, Plaintiff's
request to remove herself from confrontations was approved "with restrictions"—her supervisor
noted that she could not walk away from just any situation she "perceives is frustrating or
confrontational," and "necessary corrective actions" would still be taken.  *Id.* ¶¶ 135–36.  That
response made Plaintiff feel that she could not use the accommodation without reprimand.  *Id.*
¶¶ 138–40.  Throughout the accommodation process, her supervisor also treated her as if she was
incompetent and "less than."  *Id.* ¶¶ 121–26.

Plaintiff was then issued a letter of reprimand, which was used to justify lowering her
annual performance review in 2020.  *Id.* ¶¶ 52–54, 150–52.  That performance review
contributed to Plaintiff being denied a salary increase in 2021.  *Id.* ¶¶ 54, 108.  Plaintiff was also
denied access to training, which "would have assisted with strengthening her skill for
advancement."  *Id.* ¶ 153.  Defendant encouraged Plaintiff's coworkers to "over-scrutinize
Plaintiff's work, downgrade her performance, and harass her on a daily basis," as well as
"micromanage her tasks," and "use condescending microaggressions to undermine Plaintiff's

role." *Id.* ¶¶ 56, 61, 68.  It also refused to switch Plaintiff's first-line supervisor, despite the

supervisor's request to transfer her or Plaintiff, *id.* ¶¶ 58, 88, and required Plaintiff to complete

tasks assigned to White, male coworkers or be disciplined, *id.* ¶¶ 63–67.

Plaintiff's first-line supervisor then removed one of Plaintiff's employees from her

supervision, and later lied in a misconduct investigation by denying advising the employee not to

tell Plaintiff he had been reassigned in order to "spare her feelings." *Id.* ¶¶ 70–73.  When that

employee made an unfounded complaint to their supervisors about Plaintiff, the complaint was

"immediately addressed," and her supervisors were "excited" at the "opportunity to reprimand

Plaintiff." *Id.* ¶¶ 85–87.  Defendant also "fabricated false counter-allegations of harassment"

against Plaintiff, and falsified complaints from a Black woman subordinate to Plaintiff.  *Id.*

¶¶ 154–57.

Another employee subordinate to Plaintiff reported sexual harassment by one of

Plaintiff's supervisors in February 2021. *Id.* ¶¶ 89–90.  Plaintiff discussed the allegations with

her first-line supervisor, who lied about reporting it.  *Id.* ¶¶ 90–91, 93.  After Plaintiff reported

the allegations herself, Defendant instructed Plaintiff's supervisor to "harass her to gain more

details about her complaint." *Id.* ¶¶ 92–96.  When Plaintiff did not respond to her supervisor's

inquiry, she was reprimanded.  *Id.* ¶¶ 98–100.

Finally, Plaintiff received an unacceptable performance review in September 2021, and

her second-line supervisor consequently denied her a salary increase.  *Id.* ¶¶ 105, 108, 177, 182.

Plaintiff was then placed on administrative leave indefinitely without cause.  *Id.* ¶¶ 172–75.  She

accordingly felt obliged to retire earlier than she would have liked.  *Id.* ¶ 187.  Plaintiff also

suffered "lost wages, lost benefits, legal fees and emotional distress, anxiety, and mental

anguish" due to the discrimination.  *Id.* ¶ 186.

### B.    Procedural Background

Beginning in August 2020, Plaintiff "made over 20 complaints and disclosures to Defendant's employees with delegated authority . . . to receive and investigate employee grievances, complaints, and disclosures." *Id.* ¶ 84.  Plaintiff also filed complaints with the EEOC and Office of Inspector General in August 2020, and later filed second and third complaints with the EEOC.  *Id.* ¶¶ 141, 165, 180.  She was issued a right to sue notice on February 3, 2023, *id.* ¶ 6, and did so on April 28, 2023, *see* Compl., ECF No. 1.  She amended her Complaint in October 2023, and Defendant moved to dismiss the Amended Complaint for failure to state a claim, ECF No. 18.

## II.    LEGAL STANDARD

Under Federal Rule of Civil Procedure 12(b)(6), a defendant may move to dismiss a complaint for "failure to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).  "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted).  In other words, the plaintiff must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.* (citation omitted).  The court presumes the truth of the complaint's factual allegations under Rule 12(b)(6), *Sparrow v. United Air Lines, Inc.*, 216 F.3d 1111, 1113 (D.C. Cir. 2000), but need not "accept as true 'a legal conclusion couched as a factual allegation,'" nor "inferences [that] are unsupported by the facts set out in the complaint," *Trudeau v. FTC*, 456 F.3d 178, 193 (D.C. Cir. 2006) (citations omitted).

### III.   ANALYSIS

**A.   Count 1 – Failure to Accommodate**

In Count 1, Plaintiff claims that Defendant violated the Rehabilitation Act by failing to reasonably accommodate her disability.  *See* 29 U.S.C. § 794(a); *Solomon v. Vilsack*, 763 F.3d 1, 5 (D.C. Cir. 2014).  "To state a claim for a violation of the Rehabilitation Act's reasonable accommodation requirements, a plaintiff must allege that '(i) she was disabled . . . (ii) her employer had notice of her disability; (iii) she was able to perform the essential functions of her job with or without reasonable accommodation; and (iv) her employer denied her request for a reasonable accommodation of that disability.'"  *Menoken v. Dhillon*, 975 F.3d 1, 7 (D.C. Cir. 2020) (citation omitted).  Defendant concedes that Plaintiff is disabled, it had notice of her disability, and she was able to perform the essential functions of her job.  It argues only that it did not deny her a reasonable accommodation.

Reasonable accommodations may include, for example, "making existing facilities used by employees readily accessible," "modified work schedules," or adjusting "training materials or policies."  42 U.S.C. § 12111(9).  "It is not sufficient to merely provide a qualified individual with *any* accommodation; the accommodation needs to address the limitation arising from the individual's disability."  *Di Lella v. Univ. of D.C. David A. Clarke Sch. of L.*, 570 F. Supp. 2d 1, 8 (D.D.C. 2008).  "Whether a provided accommodation is effective or reasonable depends on the facts and circumstances of each case."  *Id.*  Consequently, courts in this district have held that "the reasonableness of an accommodation request is typically an inappropriate inquiry at the motion to dismiss stage."  *Pappas v. District of Columbia*, 513 F. Supp. 3d 64, 96 (D.D.C. 2021) (citing cases).  For example, in *Buie v. Berrien*, 85 F. Supp. 3d 161, 172 (D.D.C. 2015), defendant argued that it accommodated plaintiff's disability by changing her office location to allow her to telework and have a private office, but her other desired accommodations were not

reasonable or feasible.  The court denied defendant's motion to dismiss, reasoning that "the reasonableness of plaintiff's requests and of the solution she was eventually offered are questions of fact that are inappropriate for resolution on a motion to dismiss."  *Id.*

Plaintiff states a claim for failure to accommodate.  She alleges that she requested and was denied four separate accommodations: situational telework, an emotional support contact person, permission to remove herself from confrontation, and permission to close her office door for privacy.  Am. Compl. ¶ 199.  First, regarding situational telework, Plaintiff alleges Defendant required her to provide advance notice, which rendered telework an ineffective and unreasonable accommodation.  *Id.* ¶¶ 205–07.  Second, Defendant offered bi-weekly check-ins with a supervisor instead of an emotional contact person, but her supervisor did not follow through with the check-ins, leaving her with no accommodation.  *Id.* ¶¶ 212–17.  Third, Plaintiff alleges she was never permitted to remove herself from confrontation because she was threatened with "corrective actions" if she used this accommodation.  *Id.* ¶¶ 220–26.  And finally, Plaintiff was formally denied her request for privacy.  *Id.* ¶ 202.

Defendant argues that it *did* grant her reasonable accommodations.  Mem. in Supp. of Mot. to Dismiss, ECF No. 18-1 at 7–9 ("Mot.").  In doing so, Defendant confounds the burden on a motion to dismiss with the burden on summary judgment.  Whether the accommodations Defendant authorized were effective or reasonable "are questions of fact that are inappropriate for a resolution on a motion to dismiss."  *Buie*, 85 F. Supp. 3d at 172.

## B.  Counts 2 and 3 – Race and Sex Discrimination

### i.  *Legal framework*

Title VII prohibits "discrimination based on race, color, religion, sex, or national origin" in "[a]ll personnel actions affecting employees or applicants for employment . . . in executive

agencies" of the United States.  42 U.S.C. § 2000e-16(a).  "[T]he two essential elements of a discrimination claim" under Title VII "are that (i) the plaintiff suffered an adverse employment action," *Baloch v. Kempthorne*, 550 F.3d 1191, 1196 (D.C. Cir. 2008), and (ii) "the motive to discriminate was one of the employer's motives," *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 343 (2013).

"Courts in this Circuit 'have consistently recognized the ease with which a plaintiff claiming employment discrimination can survive . . . a motion to dismiss." *McNair v. District of Columbia*, 213 F. Supp. 3d 81, 86 (D.D.C. 2016) (quoting *Fennell v. AARP*, 770 F. Supp. 2d 118, 127 (D.D.C. 2011)).  "Though the 'initial burden' of pleading the 'because of' element is 'not onerous,'" *Keith v. U.S. Gov't Accountability Off.*, No. 21-cv-2010, 2022 WL 3715776, at *3 (D.D.C. Aug. 29, 2022) (citation omitted; formatting modified), a "plaintiff must 'allege some facts that demonstrate . . . race was the reason for defendant's actions,'" *Doe #1 v. Am. Fed'n of Gov't Emps.*, 554 F. Supp. 3d 75, 102 (D.D.C. 2021) (citation omitted).  One way that a plaintiff may plead an inference of discrimination is "by showing 'that she was treated differently from similarly situated employees who are not part of the protected class.'" *Brown v. Sessoms*, 774 F.3d 1016, 1022 (D.C. Cir. 2014) (citation omitted).  To do so, the plaintiff "must allege some facts to ground a reasonable inference that [she] was in fact similarly situated to comparator employees." *Keith*, 2022 WL 3715776, at *3.  The plaintiff, however, does not need to "nam[e] comparators," or allege "specifics" at the motion to dismiss stage. *Jbari v. District of Columbia*, 304 F. Supp. 3d 201, 209 (D.D.C. 2018) (citation omitted).

Defendant contends that the court should apply the "personnel action" definition from *Babb v. Wilkie*, 140 S. Ct. 1168, 1173–74 (2020), in determining whether Plaintiff alleged an adverse employment action.  In *Babb*, the Supreme Court interpreted the federal sector provision

of the ADEA, 29 U.S.C. § 633a(a), concluding that "age must be a but-for cause of discrimination—that is, of differential treatment—but not necessarily a but-for cause of a personnel action itself."  The Court incorporated the statutory definition of "personnel action" from the Civil Service Reform Act of 1978 ("CSRA"), which "broadly defines a 'personnel action' to include most employment-related decisions, such as appointment, promotion, work assignment, compensation, and performance reviews."  *Id.* (citing 5 U.S.C. § 2302(a)(2)(A)). The only Courts of Appeals to consider whether *Babb* applies to § 2000e-16—Title VII's federal sector provision—have concluded that it does.  *Babb v. Sec'y, Dep't of Veterans Affs.*, 992 F.3d 1193, 1198–1205 (11th Cir. 2021) (applying *Babb*'s causation holding to § 2000e-16(a)); *Huff v. Buttigieg*, 42 F.4th 638, 645–46 (7th Cir. 2022) (same).

        In interpreting Title VII's private sector provision, however, the D.C. Circuit recently held that all a plaintiff need establish under Title VII's "plain text" is "that an employer has discriminated against an employee with respect to that employee's 'terms, conditions, or privileges of employment' because of a protected characteristic"—no proof of "objectively tangible harm" is required.  *Chambers v. District of Columbia*, 35 F.4th 870, 874–75 (D.C. Cir. 2022) (en banc).  But rather than "terms, conditions, or privileges of employment," the text of § 2000e-16(a) prohibits discrimination in "personnel actions affecting employees."  In doing so, *Chambers* expressly overruled the D.C Circuit's decision in *Brown v. Brody*, 199 F.3d 446 (D.C. Cir. 1999), which interpreted § 2000e-16.  *Chambers*, 35 F.4th at 875 ("*Brown*'s approach is clearly mistaken.").

        Because *Chambers* overruled *Brown*, it is binding D.C. Circuit precedent that *Chambers* applies to § 2000e-16.  *See Cameron v. Blinken*, No. 22-cv-31, 2023 WL 5517368, at *4 (D.D.C. Mar. 22, 2023) ("Because it remains binding Circuit case law that Title VII's public and private

sector provisions 'contain identical prohibitions,' *Chambers* governs here."); *Garza v. Blinken*, No. 21-cv-2770, 2023 WL 2239352, at *4–5 (D.D.C. Feb. 27, 2023) (same).  The only court in this district to consider *Babb* and *Chambers* together, moreover, held that "the D.C. Circuit has consistently interpreted Title VII's federal-sector and private-sector language in parallel, and there is no sign that *Chambers* wedged those provisions apart."  *Doe v. Austin*, No. 22-cv-3474, 2024 WL 864270, at *10 (D.D.C. Feb. 29, 2024).  Other courts in this district have also applied *Chambers* to § 2000e-16 without considering *Babb*.  *See, e.g.*, *Black v. Guzman*, No. 22-cv-1873, 2023 WL 3055427, at *6–7 (D.D.C. Apr. 24, 2023); *Leach v. Yellen*, No. 18-cv-3075, 2023 WL 2496840, at *5–6 (D.D.C. Mar. 14, 2023).  The court will therefore apply *Chambers*' "terms and conditions of employment" standard to Plaintiff's § 2000e-16 claims.

*Chambers* held that "terms, conditions, or privileges of employment" include "the transfer of an employee to a new role, unit, or location," and that the phrase "evinced an intent to strike at the entire spectrum of disparate treatment in employment."  35 F.4th at 874.  Of course, "the phrase is not without limits"—it may not include "de minimis harms."  *Id.* at 874–75.  Although "not all changes in work assignments necessarily constitute adverse actions" under *Chambers*, "actions that meet this test include transferring an employee to a new position, firing an employee, decreasing pay," "stripping [an employee] of the duties normally associated with that" position, or giving an employee "significantly different responsibilities."  *Yazzie v. Nat'l Org. for Women*, 712 F. Supp. 3d 56, 79 (D.D.C. 2024); *Montgomery v. McDonough*, 682 F. Supp. 3d 1, 11 (D.D.C. 2023); *accord Holmes v. Wash. Metro. Area Transit Auth.*, No. 22-cv-1478, 2024 WL 864217, at *9 (D.D.C. Feb. 29, 2024) ("suspension, demotion, and docking of pay" "are textbook examples of" adverse actions).  Actions that do not meet this test include inquiring about an employee's performance, reprimanding an employee, giving an employee a

poor performance review, investigating an employee for an alleged violation of company policy, or failing to investigate an employee's complaints. *Heavans v. Dodaro*, 648 F. Supp. 3d 1, 14 (D.D.C. 2022); *Holmes*, 2024 WL 864217, at \*9; *accord Moore-Davis v. U.S. Dep't of the Navy*, 694 F. Supp. 3d 116, 124 (D.D.C. 2023).

<blockquote>

ii. *Many of Plaintiff's allegations state a claim of race and sex discrimination*
</blockquote>

Plaintiff alleges she was discriminated against based on race and sex because her employer showed favoritism to White, male employees, required her to take courses on writing in "plain English" and on "interpersonal communication," micromanaged her work, required her to take additional steps to obtain approval for contract funds, required her to complete tasks assigned to White and male employees and then disciplined her for not doing so, failed to inform her that she must respond to inquiries made regarding her complaints, subjected her to investigations, "unwarranted 'notes of caution,' letters of reprimand, lowered performance reviews," denied her a salary increase, Am. Compl. ¶¶ 237, 258, falsified documents in response to her discrimination complaint, *id.* ¶¶ 184–85, placed her on administrative leave indefinitely without cause, *id.* ¶ 174, denied her access to training, *id.* ¶¶ 153, 239, denied her a new supervisor, *see id.* ¶ 269, fabricated a complaint against her, *id.* ¶¶ 60, 156, and constructively discharged her, *id.* ¶ 187.

Many of Plaintiff's alleged adverse actions state a claim under *Chambers*. First, as courts in this district have explained, decrease in pay, suspension (or here, involuntary placement on administrative leave), and constructive discharge "are textbook examples" of adverse actions. *Holmes*, 2024 WL 864217, at \*9; *accord Yazzie*, 712 F. Supp. 3d at 78–79. Second, Plaintiff's allegations that she was required to take additional steps to obtain funding and to complete her coworkers' tasks are sufficient, at the motion to dismiss stage, to plead that she was given

"significantly different responsibilities." *Yazzie*, 712 F. Supp. 3d at 79. Finally, Plaintiff's allegations that she was not given a new supervisor after requesting one, was denied access to training that would have improved the quality of her work, and had complaints fabricated about her all state a claim under *Chambers* because they created significant hurdles to her ability to complete her work. *See id.*

Some of Plaintiff's allegations, however, do not state a claim. First, her allegation that she was required to attend two one-time training courses does not plead that she was given "significantly different responsibilities," affecting the terms or conditions of her employment. *Id.* Second, her allegations that she was investigated, reprimanded for not completing tasks, issued notes of caution, letters of reprimand, and received lowered performance reviews are the same allegations that the court determined did not state a claim in *Heavans*, 648 F. Supp. 3d at 14. And finally, Plaintiff's allegations that her employer showed favoritism to her White, male coworkers, and did not inform her that she must respond to inquiries from her supervisor, while unprofessional, did not affect the "terms, conditions, or privileges" of her employment. *See Chambers*, 35 F.4th at 874.

Defendant argues that none of Plaintiff's allegations state a claim because they had no "discernible impact on Plaintiff's employment." Mot. at 13–15. The court disagrees. For example, Plaintiff alleges that her workload was increased when she was forced to take additional steps to complete tasks and take on her coworkers' tasks, that she was denied a salary increase, and that she had to retire early to escape the discrimination. Am. Compl. ¶¶ 187, 237–39, 258. Those allegations are sufficient to state a claim.

Plaintiff, on the other hand, argues that all her allegations are adverse actions because, while the "average person" might experience some of her allegations as "petty slights," she "has

known mental disabilities, including anxiety disorder, major depression disorder, and PTSD."
Mem. of P. & A. in Supp. of Pl.'s Opp'n to Def.'s Mot. to Dismiss, ECF No. 20-2 at 18–19
("Opp'n").  But the *Chambers* analysis "is a purely objective inquiry."  35 F.4th at 877.
Consequently, the court cannot take into account Plaintiff's particular mental and emotional
circumstances in determining whether Defendant took adverse actions.

Defendant also argues that Plaintiff failed to allege a causal connection between the
adverse actions and her race or sex because her allegations that her comparators were similarly
situated to her are "conclusory."  Mot. at 15–16.  Defendant once again overstates the burden at
the motion to dismiss stage.  Plaintiff gave eight examples of comparators—Jeff Hayes, Michael
Wiggett, Sharon Wagner, Hillary Clark, Keli Martin, Michelyn Boyd, Ivy Williams, and
Matthew Payer.  Am. Compl. ¶ 15.  These comparators were at a similar salary grade to Plaintiff
and most were also supervised by Plaintiff's supervisors.  *Id.*  Plaintiff therefore "allege[d] some
facts to ground a reasonable inference that [she] was in fact similarly situated to comparator
employees."  *Keith*, 2022 WL 3715776, at *3.

### C.    Count 4 – Retaliation

#### i.    *Legal framework*

To state a retaliation claim, "a plaintiff must allege: (1) she engaged in protected activity;
(2) she was subjected to an adverse employment action; and (3) there was a causal link between
the protected activity and the adverse action."  *Menoken*, 975 F.3d at 5 (citation omitted).  The
adverse action requirement to state a retaliation claim differs from that needed to state a discrete
discriminatory act claim.  *Muldrow v. City of St. Louis*, 144 S. Ct. 967, 976 (2024).  An adverse
action must be "materially adverse" for retaliation purposes, meaning "it well might have
dissuaded a reasonable worker from making or supporting a charge of discrimination."

*Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006) (citation omitted); *see Muldrow*, 144 S. Ct. at 976 (reiterating that "materially adverse" remains the adverse action standard for retaliation claims); *Baloch*, 550 F.3d at 1198 (applying "materially adverse" standard to Rehabilitation Act).  Materially adverse actions are "not limited to discriminatory actions that affect the terms and conditions of employment."  *Durant v. D.C. Gov't*, 875 F.3d 685, 697 (D.C. Cir. 2017) (citation omitted).

Denial of financial awards, low performance ratings resulting in loss of financial awards, making false reports to government authorities, and termination "involve conduct that [the D.C. Circuit] or the Supreme Court has already indicated can support a retaliation claim."  *Steele v. Schafer*, 535 F.3d 689, 696 (D.C. Cir. 2008).  Similarly, the D.C. Circuit has held that increasing an employee's workload fivefold to keep an employee too busy to file complaints counts as an adverse action.  *Mogenhan v. Napolitano*, 613 F.3d 1162, 1166–67 (D.C. Cir. 2010).  By contrast, letters of reprimand setting forth allegations of deficient work performance, *Durant*, 875 F.3d at 698, lowered performance evaluations unrelated to loss of pay, "alteration of job responsibilities," *Taylor v. Solis*, 571 F.3d 1313, 1321 (D.C. Cir. 2009), and other actions that result in mere "trivial harms" are not materially adverse action, *Ramos v. Garland*, 77 F.4th 932, 940 (D.C. Cir. 2023) (citation omitted).

Temporal proximity between protected activity and an adverse action alone can support an inference of causation "where the two events are 'very close' in time."  *Woodruff v. Peters*, 482 F.3d 521, 529 (D.C. Cir. 2007) (citations omitted).  The D.C. Circuit has found temporal proximity of less than one month to be close enough in time to support such an inference, *id.*, but temporal proximity of two and a half months to be "untenable," *Taylor*, 571 F.3d at 1322.  Alternatively, a plaintiff can plead an inference of causation by alleging their employer engaged

in a "pattern of antagonism" in the intervening period.  *Id.* at 1323.  But such a pattern requires more than a stray occasion of criticism or yelling.  *See id.* at 1322–23.

> ii.     *Only Plaintiff's allegations of a lowered performance review and letter of reprimand state a claim*

Plaintiff alleges that Defendant retaliated against her through the same adverse actions as she alleges in her discrimination claims, including by subjecting her to investigations, giving her unwarranted letters of reprimand, lowering her performance review, and denying her a salary increase.  Am. Compl. ¶ 269.  She fails, however, to plead a causal connection between most of her alleged adverse actions and Defendant's knowledge of her protected activity.

Plaintiff alleges she filed an EEOC Complaint in August 2020 and Defendant was on notice of that action by August 26, 2020.  *Id.* ¶¶ 141, 148.  She also claims she filed another EEOC Complaint and one Office of Special Counsel Complaint, *see id.* ¶¶ 5, 50, 269, but does not provide any dates for when those were filed, let alone when she put her employer on notice about them.  She claims she filed an Office of the Inspector General Complaint on August 18, 2020, *id.* ¶ 51, but again fails to provide any information regarding when her employer was put on notice of her protected activity.  Plaintiff does not allege any pattern of antagonism or other connection between her protected activity and adverse actions.  Consequently, she pleads causation only for adverse actions taken within two or so months of August 26, 2020.

Plaintiff argues that "entire series of these events all occurred within approximately 18 months," so causation "can be inferred from the temporal proximity."  Opp'n at 27.  She cites no case, however, for the notion that 18 months is sufficiently close to infer temporal proximity, which contradicts the D.C. Circuit's holding that the one-to-two-month range is the limit for inferring causation from temporal proximity.  *Compare Woodruff*, 482 F.3d at 529 (one month sufficient), *with Taylor*, 571 F.3d at 1322 (two and a half months insufficient).

Plaintiff alleges three potential adverse actions within the relevant timeframe: (1) a letter of reprimand issued on or about September 30, 2020, that "negatively affected her promotions or future job opportunities," Am. Compl. ¶¶ 53, 150; (2) having to attend an interpersonal communication course in September 2020, *id.* ¶ 272; and (3) a lowered annual performance review in October 2020, *id.* ¶¶ 54, 152.  Plaintiff's allegation that she was forced to attend an interpersonal communication course fails to state a claim of a materially adverse action because it was, at most, a temporary "alteration of job responsibilities," *Taylor*, 571 F.3d at 1321, that would not "dissuade[] a reasonable worker from making or supporting a charge of discrimination," *White*, 548 U.S. at 68.  By contrast, her allegations that she was issued a letter of reprimand and had her performance review lowered are actionable adverse actions because she sufficiently pleaded that they were causally connected to her denial of a within-grade salary increase in 2021.  *See* Am. Compl. ¶¶ 150, 173, 177, 239, 269; *see also Steele*, 535 F.3d at 696; *Taylor*, 571 F.3d at 1321.

Defendant argues that denying Plaintiff a within-grade salary increase in 2021 was not a foreseeable consequence of her letter of reprimand and lowered performance review almost one year prior, citing *Bain v. Office of Attorney General*, 648 F. Supp. 3d 19, 58 (D.D.C. 2022). Mot. at 20.  The court disagrees.  In *Bain*, 648 F. Supp. 3d at 31–32, 58, a court in this district held that plaintiff's termination in September 2020 was not a "foreseeable" result of receiving a letter of counseling in June 2015 and poor performance review in August 2015 because the "connection between the events" was "apparent only in hindsight and would have been entirely speculative at the time."  In this case, however, there was less than a year between Plaintiff's poor performance review and letter of reprimand and the denial of a salary increase.  It was far more foreseeable at the time that Plaintiff could be denied a salary increase in the coming year

because of poor performance than it was that Bain would be terminated five years after she received a letter of counseling and poor performance review.

> ### D.   Count 5 – Hostile Work Environment

>> #### i.   Legal framework

To prevail on a hostile work environment claim, "a plaintiff must show that his employer subjected him to 'discriminatory intimidation, ridicule, and insult' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive work environment.'" *Baloch*, 550 F.3d at 1201 (quoting *Harris v. Forklift Sys.*, 510 U.S. 17, 21 (1993)).  "Severity and pervasiveness are complementary factors." *Yazzie*, 712 F. Supp. 3d at 87 (citation omitted).  Consequently, although a hostile work environment is typically "comprised of a series of separate acts that collectively constitute one unlawful employment practice," *Singletary v. District of Columbia*, 351 F.3d 519, 526 (D.C. Cir. 2003) (citation omitted), it could also constitute "a single, particularly severe incident," *Yazzie*, 712 F. Supp. 3d at 87 (citation omitted).

To state a hostile work environment claim, a plaintiff must allege that (1) she is a member of a protected class, (2) she was "subjected to unwelcome harassment," (3) "the harassment occurred because of [her] protected status," (4) the harassment was "severe to a degree which affected a term, condition, or privilege of employment," and (5) "the employer knew or should have known about the harassment, but nonetheless failed to take steps to prevent it." *Outlaw v. Johnson*, 49 F. Supp. 3d 88, 91 (D.D.C. 2014) (citation omitted).

"[C]ourts in this jurisdiction frown on plaintiffs bootstrapping discrete claims of discrimination and retaliation into a broader hostile work environment claim." *Foxworth v. McDonough*, 712 F. Supp. 3d 1, 11 (D.D.C. 2024) (citation omitted).  Consequently, isolated

allegations that a plaintiff "was denied promotions, hired at a lower initial grade, and given subjective job-performance reviews" typically "cannot alone support a hostile-work-environment claim." *Outlaw*, 49 F. Supp. 3d at 91.  Instead, the plaintiff must allege "intimidation, ridicule, or insult in [her] day-to-day work environment." *Id.* (citation omitted).   For example, in *Wise v. Ferriero*, 842 F. Supp. 2d 120, 126 (D.D.C. 2012), a court in this district held that plaintiff alleged a hostile work environment claim because he alleged "continuous harassment," including being called a racial slur, receiving threats of discipline based on false accusations, being singled out and excluded from training, and being denied promotions.  *Accord Yazzie*, 712 F. Supp. 3d at 86–87.  Similarly, in *Holmes-Martin v. Leavitt*, 569 F. Supp. 2d 184, 193 (D.D.C. 2008), the court found plaintiff's allegations that her employer treated her negatively, including by ridiculing her continuously over time and causing her psychological illness, sufficient to state a claim.

### ii.    *Plaintiff states a hostile work environment claim*

Plaintiff alleges that she suffered a hostile work environment because Defendant encouraged her coworkers to fabricate complaints about her, showed favoritism to her White, male coworkers, required her to attend additional training courses, micromanaged her work, required her to take additional steps to obtain contract funding, required her to complete her coworkers' tasks when they failed to do so and then disciplined her if she did not, subjected her to unwarranted investigations, reprimands, and lowered performance reviews, and prevented her from using her accommodations.  Am. Compl. ¶ 287.  At the motion to dismiss stage, these allegations collectively suffice to state a claim of a hostile work environment by painting a picture of continuous negative treatment constituting "intimidation, ridicule, or insult in [her] day-to-day work environment."  *Outlaw*, 49 F. Supp. 3d at 91; *see also Wise*, 842 F. Supp. 2d

at 126; *Holmes-Martin*, 569 F. Supp. 2d at 193.  The harassment resulted in tangible

consequences to her employment, including rendering her ineligible for a salary increase,

Am. Compl. ¶ 287, and exacerbated her health issues, including her anxiety, *id.* ¶ 293.  *See*

*Holmes-Martin*, 569 F. Supp. 2d at 193 (harassment contributed to psychological illness).

      Defendant first argues that Plaintiff's allegations "fall short of the high hurdle required to

plead a hostile work environment claim," citing several cases in this district.  Mot. at 26–28.  In

each case Defendant cites, the court found that the plaintiff alleged typical workplace clashes

that were not  severe or pervasive.  *See Barrett v. Pepco Holdings*, 275 F. Supp. 3d 115, 122–23

(D.D.C. 2017) (allegations that plaintiff was segregated from her peers, given reduced break

times, and was subjected to greater scrutiny during breaks did not "rise to the level of conduct

that supports a hostile work environment claim"); *Golden v. Mgmt. & Training Corp.*, 266

F. Supp. 3d 277, 286 & n.7 (D.D.C. 2017) (administrative concerns and placement on

performance improvement plan insufficient); *Allen v. Napolitano*, 774 F. Supp. 2d 186, 205

(D.D.C. 2011) (allegations that plaintiff was excluded from meetings, given unreasonable

deadlines, denied training opportunities, and assigned "busy work" did not include "objectively

tangible harm to the terms or conditions of her employment"); *Heavans*, 648 F. Supp. 3d at 18

(allegations "paint[ed] a picture of repeated clashes with an allegedly hostile and rude

supervisor," but were not sufficiently "offensive, intimidating, or out of the ordinary in a typical

workplace to change the conditions of the plaintiff's employment"); *Sandler v. Blinken*, No. 21-

cv-2226, 2022 WL 4547557, at *10 (D.D.C. Sept. 29, 2022) (allegations consisted of work-

related actions by supervisors and stray "offensive utterances" (citation omitted)); *Taylor v.*

*Haaland*, No. 20-cv-3173, 2022 WL 990682, at *4–5 (D.D.C. Mar. 31, 2022) (allegations that

plaintiff's arrival and departure time were monitored, she was taunted by coworkers, given a set

lunch hour, was suspended from her employment, investigated, and offered an unconscionable settlement agreement involved issues with her "work product" rather than a hostile environment).  Here, Plaintiff's allegations, however, go beyond typical workplace clashes.  She claims that Defendant not only increased her workload in several ways, but also encouraged her coworkers to fabricate complaints against her, intentionally lowered her performance evaluations, and issued reprimands because of her protected classes.  Rather than a disagreement with her supervisor, Plaintiff alleges a workplace turned against her that continuously placed additional hurdles in her way while favoring her White, male coworkers.

Defendant also argues that Plaintiff's allegations constitute "little more than an additional label that she has placed on a series of discrete discrimination and retaliation claims."  Mot. at 28.  This argument, however, was "expressly rejected by the D.C. Circuit's . . . decision in *Baird v. Gotbaum*, 662 F.3d 1246 (D.C. Cir. 2011)."  *Wise*, 842 F. Supp. 2d at 126.  In *Gotbaum*, 662 F.3d at 1252, the D.C. Circuit clarified that there is "no authority for the idea that particular acts cannot as a matter of law simultaneously support different types of Title VII claims, and of course, plaintiffs are free to plead alternative theories of harm that might stem from the same allegedly harmful conduct."  Consequently, discrete discriminatory acts simply "must collectively meet the independent requirements" of a hostile work environment claim and be "part of the same unlawful employment practice."  *Id.* (citation omitted).  Plaintiff has pleaded a continuous pattern of harassment that is made up in part of discrete discriminatory acts, many of which also support her discrimination and retaliation claims.

## IV.    CONCLUSION

For the foregoing reasons, the court will GRANT in part and DENY in part Defendant's

Motion to Dismiss, ECF No. 18.  An Order will accompany this Memorandum Opinion.


Date: September 27, 2024


*Tanya S. Chutkan*
TANYA S. CHUTKAN
United States District Judge